112

## SALTER v. STERLING APTS., Inc.
### No. 61-C-12907.

Circuit Court, Dade County.
March 23, 1962.

Smith & Mandler, Miami Beach, for plaintiff.

Montague Rosenberg and Nelson & Spielvogel, all of Miami Beach, for defendant.

ROBERT H. ANDERSON, Circuit Judge.

On December 1, 1961, Harry Salter filed a complaint against Sterling Apts., Inc., to foreclose a second mortgage on the defendant's apartment house in Miami Beach. The basis of the foreclosure was a mortgage given by Rintay Estates, Inc., to Bayvue, Inc. on November 1, 1956, to secure a promissory note of that date for $82,300. The note was payable in 59 quarterly instalments of $617.25 each on February 1, May 1, August 1 and November 1 of each year, and the balance of $45,882.25 on November 1, 1971. All payments bore interest at 5%.

The basis of the complaint for foreclosure was the alleged failure of the defendant, Sterling Apts., Inc., assignee of the former owner, to pay an instalment due November 1, 1961, and accrued interest from August 1 to November 1, 1961, in the sum of $882.15,

making a total of $1,499.43. The sums indicated were alleged to be in default for more than thirty days from November 1, 1961.

The defendant, Sterling Apts., Inc., which had assumed the mortgage, defended on equitable grounds that it had tendered into the registry of the court sums sufficient to pay all its obligations under the mortgage, and that the plaintiff had visited the office of the defendant on several occasions and knew that the defendant had more than a million dollars invested in adjoining properties which are part of its hotel operations under the name of "Bagdad on Biscayne", and had observed the site of new construction on adjoining premises for more than $400,000, and knew that the defendant had always paid not only the instalments on its mortgage within 5 or 6 days of the due date, and always 25 days or more prior to the expiration of the grace period, and that the non-payment was due to the fact that the defendant's brother-in-law, one Pollock, suddenly left the defendant's employ on October 29, 1961, taking with him all records concerning the due date of the mortgage, and that shortly after Pollock left, the defendant's president called Pollock for records herein and was advised that the records were in a black book on the desk, and that an employee working on the black book found only one entry — "Salter-Dade Commonwealth", and since such employee was a switchboard operator not used to bookkeeping and knew that she had made the ground lease payment, thought that the record referred to the ground lease payment and assumed that it was paid. This employee further checked through the check book and because the instant mortgage was a quarterly payment saw no record of payment of a previous month and in making her checks out, through ignorance, failed to include the payment.

The defendant claims that it is entitled in equity to be relieved of the penalty sought to be imposed because of the mistake over which it alleges it had no control. It maintains that it was ready and willing to pay all reasonable costs and expenses of the plaintiff, as actually sustained as a result of the oversight.

On final hearing the plaintiff offered in evidence his note and mortgage and proof of non-payment, and the testimony of attorneys as to a reasonable fee.

The defendant produced the president of Sterling Apts., Inc., who testified that he was a resident of Illinois, and that the other officers were Ray Server, the secretary, and Julius J. Schwartz, the treasurer, who also resided in Illinois. He said that his father, Samuel Server, who was 86 years old, had charge of the management of the apartment house covered by the mortgage. It contained fourteen units, and approximately 200 separate apartments in 10 separate buildings.

Sterling Apts. purchased the leasehold on this property in 1959. Mr. Server said that one Barney Pollock, an employee of his company, was in charge of payments on the mortgage in October and November of 1961, until some time in October, 1961. Mr. Server did not know what records were used by Pollock. He pretty much had his own system.

When the court asked him where this man Barney Pollock was, he answered — "He walked out one morning during an argument with my father". "That was in October — he just walked out the door and that was it".

By the Court: "He is not available?"

The Witness: "No, sir".

Mr. Server said further that when Barney Pollock walked out, a Mrs. Phyllis Venable took over the responsibility of writing the checks for the mortgages and leases and that she was present. He said further than when Pollock left, he relied upon his father to set up the new financial operation, but his father is not an officer or director of the corporation.

Mrs. Venable testified that she had been employed by Sterling Apts. for four years as a switchboard operator, but that they gave her different duties to do. Starting the first of November, she had to make out the monthly payment checks. Mr. Sam Server told her to make out the payments on November 1 and she had done so since then. Mrs. Venable testified —

What happened to cause you to start making out payment checks on November 1? — Mr. Pollock who took care of all that, left one day and didn't come back.

Did he leave behind any records, as far as you know, that would aid you in making payments? — Nothing at all.

On November 1, 1961, did you make some payments out of the checkbook? — Yes, I did.

What did you use as a basis for making those payments on November 1, 1961? — The check stubs from the month before.

That included whatever payments had been made during the 30 days prior, during the month of October, 1961, is that correct? — That's right.

Did you, during the month of November, 1961, discover any other records among the records of the office that would help you to make payments? Did you discover any other books or records? — Not until later in the month.

What did you discover then? — Well, I called Mr. Pollock on the phone and asked him where I could find interest and principal on these payments, and he said there were sheets in the back of the little black book in the safe.

Did you find a little black book in the safe? — Yes, I did.

When you discovered this additional document to help you to prepare payments, about what day in November was it? — It may have been the 20th to the 25th.

What did you find written in that little black book for the date of November 1, 1961? — Harry Salter, Bayvue.

Why did that not cause you to send a check to Mr. Salter? — Well, I didn't know what it was.

## And further—

When did you first hear from Mr. Salter or about Mr. Salter, that there was money due to him? — Well, I heard about it when I went to the office and you called me.

About what date was that, do you recall? — About the 5th or 6th of December.

Is that the first time that you knew you were supposed to pay anything to Mr. Salter? — The first time I ever heard of it.

## And again—

Did anybody else call you on behalf of Mr. Salter and ask you for the payment during the hours that you were on duty? — No.

## And on cross-examination—

Mrs. Venable, it is your testimony that on or about November 20 you found this book and you looked at it and had a notation of November 1, Harry Salter, Bayvue, but since you could not find any loan amortization schedule you just ignored that notation in the book? — Well, it said Bayvue, so I thought it was Bayvue for Dade Commonwealth.

## And further—

In other words, you just were going to look in the checkbook and whatever payments were made the preceding month, you were going to make those same payments? — Right.

## And again—

You called Mr. Pollock sometime in the middle of November, this former bookkeeper, to ask him where these records were; is that correct? — I asked him where the interest and principal sheets were.

He told you that that black book was in the safe? — He said they were in the back of the black book.

The court is not especially impressed with the equitable character of the defense. It thinks that the defendant's conduct was negligent, to put it mildly. To have an 86 year old man superintend property of this character is bad enough; to allow the bookkeeper to "walk out" and make no effort to replace him is worse. It is conduct that scarcely can be condoned. However, it is safe to say that this may be a lesson to them and they perhaps will not

do it again, especially after they begin to realize what a close call they had.

The court is going to sustain the equitable defense, even though it isn't running over with equity.

In the case of Lieberbaum v. Surfcomber Hotel Corp. (Fla.), 122 So.2d 28, the District Court of Appeal for the Third District, on July 18, 1960, affirmed a decree of this court (Hon. George E. Holt, J.) dismissing the complaint to foreclose mortgages on the hotel for the payment of interest which had been paid into the registry of the court. It held that where the plaintiffs were desirous of regaining possession of the mortgaged property and believed an acceleration would render it impossible for defendants to protect their equity in the property and plaintiffs could have secured payment by simple demand and prevented acceleration and possible forfeiture, acceleration was unconscionable and a foreclosure based thereon was properly denied. That seems to fit the present case.

Accordingly, the complaint is hereby dismissed.

The clerk of this court is instructed and directed to pay to the plaintiff's counsel of record, the sums of money deposited by the defendants in the registry of the court.